2023 IL App (1st) 170761

SIXTH DIVISION
February 10, 2023

No. 1-17-0761

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 12 CR 18935 |
| | ) | |
| HAVIER COX, | ) | Honorable |
| | ) | Michael B. McHale, |
| Defendant-Appellant. | ) | Judge Presiding. |

Justice Tailor delivered the judgment of the court, with opinion.
Presiding Justice Mikva and Justice Oden Johnson concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant, Havier Cox,[1], was charged by way of indictment with four counts of first

degree murder for his involvement in the shooting death of Roy Williams. The State proceeded

to trial on two of the counts based on a theory of accountability. Following a jury trial, Cox was

_____

[1] Codefendant Anthony Newburn is not a party to this appeal.

found guilty of both counts and was sentenced to 41 years' imprisonment, with 3 years of mandatory supervised release and credit for 2187 days served in presentence custody.

¶ 2 Prior to trial, Cox filed a motion to quash arrest and suppress statements, arguing, *inter alia*, that he was unlawfully detained and questioned without sufficient *Miranda* warnings. See *Miranda v. Arizona*, 384 U.S. 436 (1966). After a hearing, the circuit court denied Cox's motion. Cox later filed an amended motion to suppress statements and argued that his confession was involuntary and that his right to remain silent was not honored by police officers during the interview process. The court denied Cox's motion to suppress statements following a hearing on the motion where the court viewed the entirety of Cox's time in custody on video.

¶ 3 Thereafter, Cox filed a motion *in limine* to bar the introduction of "inadmissible evidence from the ERI," arguing that certain portions of his electronically recorded interview (ERI) violated the rules against hearsay. The circuit court denied the motion. Subsequently, the State filed a motion to, *inter alia*, prevent Cox from introducing exculpatory portions of his ERI. The circuit court stated that it would reserve ruling on the admissibility of the portions at issue until they came up at trial. Cox also filed a motion *in limine* to produce additional discovery pursuant to Illinois Supreme Court Rule 412 (eff. Mar. 1, 2001), arguing that information about the murder of Sherelle Williamson approximately 20 days prior to the shooting of Roy Williams was necessary for him to "present an alternative suspect theory of defense." The circuit court denied Cox's motion, as well as his subsequent motion to reconsider.

¶ 4 Chicago police detective Ernest Cato testified that on February 12, 2011, he was assigned to investigate the homicide of Roy Williams that occurred on November 28, 2009. Cox had been arrested for "being involved in a possible homicide" and was at the police station. Cox was taken

to an interview room equipped with video and audio recording equipment and informed of his *Miranda* rights. When Detective Cato's shift ended, Cox talked with other detectives. When Detective Cato returned the next day, Cox knocked on the door of the interview room at 6:35 p.m. and asked to speak to Detective Cato alone. When Detective Cato entered the room, he reread Cox his *Miranda* warnings. Cox then told Detective Cato about his involvement in the murder of Roy. This conversation was recorded on video. Portions of this ERI were played for the jury.

¶ 5    The ERI shows that Detective Cato advised Cox of his *Miranda* warnings and ensured that Cox understood his rights. Cox then told Detective Cato that, prior to the shooting, Roy, whom Cox knew as "Nose," had his home burglarized and a television was stolen. Soon thereafter, Roy confronted "Charell [*sic*], Dominique, Tweety, and Antonio about the TV." The following week, Roy shot at a group of people on 15th Street and Drake Avenue in Chicago, including Sherell Williamson, but missed them. Later that same day, the group was sitting in a car at 15th Street and Christiana Avenue, and Roy shot at them again, killing Sherelle.

¶ 6    A few days after Sherelle was killed, Cox was at Quentin Vaughn's home at 15th Street and Spaulding Avenue, with Raymond Blount, Dominique Black, Devonjae Strong, and Anthony Newburn. They talked about "stealing a car and proceeding to shoot Roy Williams." They stole a maroon van. At about 9:00 p.m. on November 28, 2009, Devonjae was driving the van, Anthony was in the front passenger seat, Quentin was behind Devonjae, and Raymond was behind Anthony. The van pulled up to Cox, and someone asked him, "[W]e finna go get down on this n***a, for killing our little homie. You finna come with us?" Cox knew this to mean that they were going to "get down" on Roy for killing Sherelle. Cox then got into the van and sat in

the back seat between Quentin and Raymond. Cox had two surgical masks when he got into the van; he was wearing one and gave one to Devonjae. Cox did not see anyone else in the van with a surgical mask.

¶ 7    Cox noted that everyone else was wearing medical gloves. Cox saw Anthony with a metallic-colored automatic handgun. Anthony asked the group, "Y'all got y'all burners?" and "Do y'all have y'all guns? I have mines. I'm ready." Quentin and Raymond said, "Hell yeah," but Cox did not see any other guns. The group then began looking for Roy's car. Cox stated that he eventually told the others to let him out and "I don't wanna ride with y'all." The others then called Cox "a b***h" and told him, "[J]ust be the lookout *** because he gonna ride down Central Park because he got people hustling for him just stay right here, and if you see him, just call our phone." Cox stated that he got out of the van near a bus stop at 13th Street and Central Park Avenue. Cox said that he lost his mask as he got out of the van. Cox admitted that he had Raymond's cell phone and was instructed to call the group if he saw Roy. Approximately 15 to 20 minutes later, the group came around in the van again, and Cox saw Quentin get out of the rear door and start shooting. Anthony got out and also started shooting.

¶ 8    A few days after the shooting, Cox saw Dominique and Antonio talking at 15th Street and Spaulding Avenue. Dominique told Antonio, "[Roy Williams] must be dead. His sister was crying at school, so we had to get that n****r." Cox told Detective Cato that he did not call the police, because he "was afraid. Of not, of what might happen to me, but what they might do to me."

¶ 9    During the second clip of ERI that was filmed approximately one hour later, Cox clarified that the group dropped him off on the west side of Central Park Avenue at 15th Street.

Cox stated that he was at a bus stop north of a "yellow store" on Central Park, closer to Roosevelt Road. Cox then identified photographs of Devonjae, Anthony, Raymond and Quentin.

¶ 10    On cross-examination, Detective Cato testified that on November 8, 2009, several people were shot and Sherelle was killed by Roy. Detective Cato testified that he read Cox his *Miranda* warnings at approximately 4:44 p.m. on February 12, 2011. The portion of the interview played for the jury occurred approximately 26 hours later, around 6 p.m. on February 13, 2011. While questioning Cox, Detective Cato knew that Cox's DNA had been found on a mask recovered near an abandoned vehicle on November 28, 2009. The interview room where Detective Cato talked to Cox was locked with no windows and a metal bench. Detective Cato testified he told Cox that other people were talking about Cox committing the crime, but Detective Cato admitted that was not true. Detective Cato also admitted that three eyewitnesses, Deandre Feggins, Tyricia Santiago, and Dave Allen, did not identify Cox in a lineup. Detective Cato testified that on February 12, 2011, Cox was 21 years old.

¶ 11    During cross-examination of Detective Cato, the State objected to defense counsel's questioning of Detective Cato about specifics of the interview that were not included in the portions of the ERI previously played for the jury. After a discussion outside the presence of the jury, the circuit court ruled that the sections of the interview that Cox wanted to introduce, including the portion where Detective Cato was untruthful to Cox, were not admissible because Detective Cato had already admitted to being untruthful to Cox. The circuit court ruled that Cox could introduce interview clips only "if you are correcting a misleading statement that was played by the State ***. Other than that, you can talk about environmental factors, as I previously ruled, or a possible impeachment ***." After further discussion, the circuit court

5

reiterated, "[U]nless there is some direct impeachment *** I don't see any other way for you to play clips under the rules of evidence. If there is impeachment, that might be a different story."

¶ 12    On redirect examination of Detective Cato, the State sought to elicit evidence that Cox confessed to Detective Cato after taking a polygraph and being informed of the results. Cox objected, arguing that polygraphs are not reliable evidence. The circuit court overruled the objection, stating, "when the defense is that his statement was coerced by the police, which is clearly what your defense is *** it is proper for the court to admit some evidence of polygraph, but it is certainly not proper to bring in the results." Detective Cato then testified that Cox was told of the results on his polygraph test immediately prior to the portion of the ERI that was played for the jury.

¶ 13    Tyricia Santiago testified that at about midnight on November 28, 2009, she was at her sister's apartment at 13th Street and Central Park Avenue with her boyfriend, Deandre Feggins. When she and Deandre were in the hallway that night, Tyricia heard gunshots coming from the direction of 13th Place. When Tyricia looked out the door, she saw Roy in his car and someone standing in front of the car shooting at Roy. Roy tried to drive away but crashed into the car in front of him. Deandre ran out of the building and across the street. Tyricia saw a burgundy van approaching on 13th Place. The van stopped next to the passenger side of Roy's vehicle, and a person got out of the van and began shooting at Roy. Roy got out of the car and began running down Central Park toward Douglas Boulevard. The van then drove off in the opposite direction, toward 12th Place.

¶ 14    Tyricia met with detectives later that day and again in February 2011 when she gave a videotaped statement. Tyricia testified that she was unable to identify anyone in a lineup because

the individuals were wearing masks on the night of the shooting. Tyricia stated that she viewed another lineup on September 15, 2012, and was able to identify codefendant Newburn as the second shooter. Tyricia also gave a typewritten statement. Tyricia admitted that she discussed the shooting with Deandre after it happened.

¶ 15    Chicago police detective Robert Hartmann was assigned to investigate the homicide of Roy Williams. Detective Hartmann went to 3556 West Douglas Boulevard, where Roy had collapsed after being shot. A stolen van with a "peeled" steering column was recovered at 3306 West Douglas. Detective Hartmann collected surveillance video from a building near 13th Place and Central Park.

¶ 16    The parties then stipulated that, if called to testify, Derrick Middlebrook would testify that he was the manager of the property at 1269 South Central Park, which had working recording equipment on November 28, 2009. Derrick would testify that the timestamp on the surveillance video was an hour ahead. Portions of the surveillance video were then published to the jury. Those portions of the video showed the stolen van and Roy's vehicle each traveling on Central Park and showed an individual running in the opposite direction of the shooting after it occurred. The video did not depict the shooting.

¶ 17    Detective Hartmann testified that on November 30, 2009, he interviewed Tyricia Santiago at the police station. Tyricia identified Antonio Black in a photo array as the person that looked most like one of the individuals she saw shooting at Roy Williams but did not indicate whether Black looked like the first or second shooter. Neither Cox nor Anthony Newburn was among the individuals in the photo array.

¶ 18    Deandre Feggins testified that he was serving a six-year sentence in the Department of

Corrections for delivery of a controlled substance at the time of his testimony. He was friends with Roy Williams and knew him for almost 18 years. Around midnight on November 28, 2009, Deandre was in the car with Roy before he was dropped off at Tyricia's sister's apartment, on 13th Place and Central Park. Deandre was with Tyricia on the first floor of the building when he heard shooting. He saw an individual on foot in front of Roy's car shooting into the front of the car. The shooter was wearing a surgical mask over his face. Deandre then watched Roy drive away in his car, striking the shooter and crashing into a parked car. Roy and Allen got out of the car and ran in different directions. A minivan then pulled up, and a second individual got out of the rear passenger-side door and began shooting at Roy, who was running south on Central Park Avenue. The second shooter was also wearing a surgical mask, but it was not covering his face. Deandre recognized this shooter as "Gripp," someone he knew from the neighborhood. Deandre stated that codefendant Anthony Newburn was also known as "Gripp." Deandre further testified that, as Roy was being shot at by the second shooter, Roy ran up Central Park Avenue toward his stepmother's house at Douglas Boulevard. The two shooters got back in the van and headed north.

¶ 19    Germany Garrett testified that he is Roy's older half-brother. Germany testified that he had previously been convicted of two felonies in 2007 and 2011. Germany saw Roy in his car the evening of November 28, 2009. Later that night, Germany was on the corner of 13th Place and Central Park, waiting for his cousin to pick him up when he saw a van pulling off of 13th Street. Germany could see that the occupants of the van were wearing hospital masks. Germany got into his cousin's car, and they drove off. A few second later, Germany heard approximately 17 gunshots and then saw the same van leaving the area. Garrett spoke to the police a few weeks

later but did not tell them he heard gunshots or saw people in masks.

¶ 20    Dave Allen testified that he had felony convictions from 2008 and 2007. He and Roy were driving around in Roy's car on the evening of November 28, 2009, with Roy's sister and another woman. When they parked on 13th Place, the two women got out and went into a nearby building. Roy and Allen were sitting in the car when someone started shooting at them through the front window of the car. Allen ducked and did not see the person holding the gun. There were approximately eight gun shots. Roy attempted to drive away but ran into another car. Allen and Roy then got out of the car and ran toward Roy's stepmother's house on Douglas Boulevard. When they approached Roy's stepmother's house, Roy stated that he had been shot and then collapsed. Allen called the police. On February 13, 2011, Allen viewed a lineup but did not identify anyone. The parties stipulated that Cox was in the lineup Allen viewed.

¶ 21    Assistant State's Attorney (ASA) Torrie Corbin interviewed Tyricia Santiago on September 15, 2012, at the police station. ASA Corbin took a statement from Tyricia, typed and printed the statement and reviewed it with Tyricia. In that statement, Tyricia identified codefendant Newburn as the second shooter.

¶ 22    Chicago police officer Brian Smith and his partner, Officer Carl Brasic, were assigned to process the scene of a homicide at 3548 West 13th Place on November 28, 2009, at approximately 1:30 a.m. At the scene, Officer Smith recovered a cartridge case from the street at 3550 West 13th Place, a pair of latex gloves from a driveway, and a glove from the top of a garage at 3306 West Douglas Boulevard. Officer Smith also recovered a surgical mask from 3306 West Douglas. He also noted that there was a van at 3306 West Douglas with its engine running.

¶ 23    The parties then stipulated that, if called, Steven Strezepek would testify that he is a Chicago police evidence technician. On November 29, 2009, he obtained swabs and a piece of fabric that were taken from the stolen van. Mr. Strezepek would testify that he also recovered three latent fingerprints from the van.

¶ 24    The parties also stipulated that, if called, Samuel Muniz would testify that he is a Chicago police evidence technician. On December 22, 2009, he obtained a buccal swab and "elimination fingerprints" from Maria Suarez, the owner of the van. The parties also stipulated that a buccal swab was taken from Jose Mendez, a person authorized to use the van.

¶ 25    The parties further stipulated that, if called, Jose Gonzalez would testify that he is a Chicago police evidence technician. On February 13, 2011, he collected a buccal swab from Cox. The parties then stipulated that, if called to testify, Glenn Manguerra would testify that he is Chicago police evidence technician. He obtained a buccal swab from codefendant Newburn on September 15, 2015.

¶ 26    The parties further stipulated that, if called, Tracy Moore would testify that she is employed by the Illinois State Police (ISP) and is an expert in the field of latent fingerprint analysis. Moore would testify that she examined the fingerprints recovered by evidence technician Strezepek and Muniz. She also examined a brick, a pair of latex gloves, a black leather glove, a surgical mask, and a discharged cartridge case. Moore would testify that, after examining the items, she found latent impressions and lifts suitable for comparison but that the comparison did not reveal an identification.

¶ 27    Jennifer Barrett, also an employee of the ISP, testified as an expert in the field of latent fingerprint examination and identification. On September 2, 2016, Barrett received three latent

fingerprints in connection with the homicide of Roy Williams. Barrett determined that two of the latent prints were suitable for comparison but that the fingerprints were not those of Cox, codefendant Newburn, Raymond Blount, or Quentin Vaughn.

¶ 28    The parties then stipulated that, if called, Debra Klebacha, a forensic scientist with the ISP, would testify as an expert in the field of forensic biology. Klebacha would testify that she received a pair of latex gloves, a black glove, a surgical type of mask, and swabs from the rear seat, passenger's side door, and steering wheel of the van. She also received the buccal swabs of Jose Mendez, Maria Suarez, and Cox. Each of the samples was prepared for DNA analysis.

¶ 29    Jennifer Acosta-Talbot, a forensic DNA analyst with the ISP, testified as an expert in the field of forensic DNA analysis. She determined that there was a DNA mixture of at least two people on the latex glove but that Jose Mendez and Maria Suarez were excluded. She further determined that there was a DNA mixture of at least three people on the black glove and that Jose and Maria were excluded as donors. There was a DNA mixture of at least three people on the surgical mask, and the "major DNA profile" was male. That major DNA profile was entered into the DNA database and "obtained an association" to Cox. The DNA profiles from the van were unable to be profiled because there was not enough DNA.

¶ 30    Lisa Kell, a forensic scientist with the ISP, testified as an expert in the field of forensic DNA analysis. Kell received a buccal standard from Cox as a "confirmatory standard" after the previous DNA database association was discovered by Acosta-Talbot. Kell determined that Cox was excluded as a contributor for the DNA mixtures collected from the gloves but could not be excluded as the major male DNA profile from the mask. There was a "1 in 1.4 trillion" chance that a random African American would be included as a possible donor to the major male DNA

profile from the mask.

¶ 31    The parties then stipulated that, if called to testify, Pauline Gordon, a forensic scientist with the ISP, would be qualified as an expert in the field of forensic DNA analysis. Gordon would testify that codefendant Newburn was also excluded as a possible donor to the DNA mixture from the gloves.

¶ 32    Also, the parties stipulated that, if called, Dr. Lauren Moser-Wirtz would testify as an expert in the field of pathology and forensic pathology. Dr. Moser-Wirtz would testify she was an assistant medical examiner for Cook County and that she performed an autopsy on the body of Roy Williams on November 28, 2009. Dr. Moser-Wirtz would testify that she observed a gunshot wound to Roy's left chest and recovered a deformed copper-jacketed bullet from his back. Dr. Moser-Wirtz would testify that it was her opinion that Roy died of a gunshot wound and that the manner of death was homicide.

¶ 33    The parties then stipulated that, if called, Tracy Konior, an employee of the ISP in February 2011, would testify as an expert in the field of forensic science with specialized training in firearms identification. Konior would testify that the bullet recovered from Roy's body was a AS-caliber bullet and that a cartridge case recovered from the street at 3550 West 13th Place was from a .45-caliber cartridge.

¶ 34    Following the People's case-in-chief, the circuit court denied Cox's motion for directed finding.

¶ 35    Danielle Wilson testified for the defense. She testified that she is Dominique Black's mother and that Dominique was shot on November 8, 2009. Danielle testified that Dominique was in Mount Sinai hospital on the day that Roy was shot.

¶ 36    Rosa Silva testified that she is an investigator with the Cook County Public Defender. On September 21, 2016, she and one of Cox's attorneys went to 13th Place and Central Park Avenue to take photographs. There is a bus stop on the west side of the street depicted in the photographs. Silva testified that the location of the homicide could not be seen from the bus stop on Douglas Boulevard and Central Park. There were no other bus stops in the area between Douglas Boulevard and 13th Place on Central Park.

¶ 37    The parties then stipulated that, if called, Chicago police detective Kevin Bor would testify that he interviewed David Allen on November 28, 2009. Detective Bor would testify that David described the driver of the van as a "male black in his late 20s with low-cut hair and a medium complexion." Detective Bor would testify that David described a shooter as a "male black in his early 20s who was approximately five foot eight inches tall, 150 to 160 pounds, with a medium build, medium complexion." Detective Bor would testify that David never told him that either individual wore a mask.

¶ 38    Cox rested. The jury found Cox guilty of two counts of first degree murder and found that Cox was armed with a firearm. Cox's motion for a new trial was denied. Cox was sentenced to 31 years in the Department of Corrections plus a 15-year mandatory firearm-enhancement for a total of 46 years' imprisonment.

¶ 39    The circuit court subsequently granted Cox's motion to reconsider sentence in which he argued, *inter alia*, that the sentence was excessive in light of his background and the nature of his participation in the offense. The trial court then resentenced Cox to 26 years' imprisonment with a 15-year mandatory firearm-enhancement for a total of 41 years' imprisonment. This appeal follows.

¶ 40                                     ANALYSIS

¶ 41     Cox argues that the trial court erred in not suppressing his videotaped confession because he exercised his right to remain silent and the police failed to scrupulously honor his right. He also argues that his statement was not voluntary. The State responds and argues that the trial court properly denied Cox's motion to suppress where Cox did not affirmatively invoke his right to remain silent and the surrounding conditions indicated the voluntariness of his confessions.

¶ 42     In reviewing a trial court's ruling on a motion to suppress evidence, we apply a two-part standard of review. *People v. Gherna*, 203 Ill. 2d 165, 175 (2003). We must give great deference to the trial court's factual findings and will reverse only if the findings are against the manifest weight of the evidence. *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006). A trial court's factual finding is against the manifest weight of the evidence only if it is unreasonable, arbitrary, or not based on the evidence presented, or if the opposite conclusion is clearly evident. *People v. Deleon*, 227 Ill. 2d 322, 332 (2008). However, the trial court's ultimate legal conclusion as to whether suppression is warranted is subject to *de novo* review. *Gherna*, 203 Ill. 2d at 175. Where a trial court's decision on a motion to suppress is based on video recordings of the defendant's confession and not on live testimony, as in this case, the appropriate standard of review is *de novo* because "we are reviewing the same evidence the trial court reviewed." *People v. Flores*, 2014 IL App (1st) 121786, ¶ 35.

¶ 43     Both the United States and Illinois Constitutions prohibit the state from compelling an individual to be a witness against himself in a criminal prosecution. U.S. Const., amend. V; Ill. Const. 1970, art. I, § 10. In order to protect this right, it is axiomatic that, once an "individual indicates in any manner at any time prior to or during questioning that he wishes to remain silent,

the interrogation must cease." *People v. Edwards*, 301 Ill. App. 3d 966, 977 (1998) (citing *Miranda v. Arizona*, 384 U.S. at 473-74). "[A]ny statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise." *Miranda*, 384 U.S. at 474.

¶ 44 A defendant may invoke his right to remain silent either verbally or through nonverbal conduct. *Flores*, 2014 IL App (1st) 121786, ¶ 37 (citing *People v. Hernandez*, 362 Ill. App. 3d 779, 785 (2005)); see also *People v. Nielson*, 187 Ill. 2d 271, 287 (1999) (finding that the defendant invoked his right to remain silent by placing his hands over his ears, shaking his head, and saying, "nah nah nah"). However, "an invocation of the right to silence must be unambiguous, unequivocal and clear" (*People v. Kronenberger*, 2014 IL App (1st) 110231, ¶ 33), and the "demand to end the interrogation must be specific" (*Hernandez*, 362 Ill. App. 3d at 785).

¶ 45 During his interview with Detectives Cato and Doreen Velasquez, at approximately 4:30 a.m., Cox told the detectives, "I don't wanna answer no more questions, 'cause I can't help you. And I don't wanna dig myself into a hole." After Cox made this statement, Detective Cato said, "ok" and left the room, returning a few minutes later with a cup for Cox. He then left again. Detectives James Egan and Roland Rios reinitiated the questioning about three hours and 55 minutes later, without providing Cox with his *Miranda* rights again. Cox later provided details of the murder, implicating himself. Cox claims that his statement to Detective Cato "unambiguously conveyed that he did not want to answer any more questions, because he did not want to risk somehow incriminating himself" and that questioning should not have been reinitiated.

¶ 46    The State asserts that this statement by Cox was equivocal and points to exchanges between Cox and detectives earlier in the interview, about 3:45 a.m., 45 minutes earlier, where Cox made three similar assertions that he "don't have no other questions to answer" but continued talking to detectives after detectives repeatedly clarified that Cox wanted to continue talking.

¶ 47    In *Flores*, 2014 IL App (1st) 121786, ¶ 31, during his interrogation in connection with a murder investigation, detectives told the defendant that his codefendant had already talked to them regarding the murder. *Id.* Detectives then asked, " '[y]ou want to talk to us about that?' " to which the defendant replied, " '[n]ot really, no.' " *Id.* Detectives continued with the questioning, and 30 minutes later the defendant admitted to being the shooter. *Id.* ¶ 34.

¶ 48    Before this court, the defendant argued that he had invoked his right to remain silent when he said, "not really, no," and that the trial court had erred in denying his motion to suppress on that basis. *Id.* ¶ 2. The State responded that, when the defendant said, "not really, no," he was referring only to his unwillingness to speak about his codefendant and was in no way conveying his unwillingness to speak with police about other matters. *Id.* ¶ 55. We ruled that the defendant clearly invoked his right to remain silent when he said, "not really, no." As such, we reversed and remanded the case for a new trial. *Id.* ¶ 63.

¶ 49    Likewise, in *Hernandez*, 362 Ill. App. 3d 779, the defendant gave an incriminating statement to an ASA regarding his involvement in a murder. The defendant subsequently agreed to repeat his statement on video. *Id.* at 781. During the videotaped statement, the ASA summarized what the defendant had previously told her and then read him his *Miranda* rights. The following exchange occurred thereafter:

" 'Q. Understanding these rights, do you wish to talk to us now?

A. No, not no more.

Q. Do you wish to talk to us now about what we previously spoken [*sic*] to?

A. Yes.' " *Id.* at 782.

After this exchange, the defendant provided an incriminating statement about his role in the murder. *Id.* The defendant challenged his statement and argued that it should have been suppressed. We held that the defendant clearly invoked his right to remain silent when he said "no, not no more." *Id.* at 786.

¶ 50    Similarly, in *People v. Brown*, 171 Ill. App. 3d 993, 999 (1988), the defendant was being questioned by an ASA and made an incriminating statement. The defendant then agreed to have his statement memorialized by a court reporter. The defendant was advised of his *Miranda* rights, and the following exchange took place between the ASA and the defendant:

" 'Q. All right. Understanding these rights do you wish to talk to us now?

A. No.

Q. Pardon me?

A. I didn't understand.

Q. Understanding these rights, do you wish to talk to us now?

A. Well, I already told you what happened.

Q. All right. After you told me before about what happened I informed you that I was going to call a court reporter and we were going to take it down in writing, is that correct?

A. Yes, sir.

Q. Now, I've advised you of your rights. Understanding these rights do you wish to talk to us now about the incident involved on the 30th of June 1983 involving the shooting death of Renaldo Reyes?

A. Yes.' " *Id.* at 995.

¶ 51    On review, the defendant argued that "no" was a clear, unequivocal invocation of his right to remain silent and questioning should have ceased. The State argued the defendant did not invoke his right to remain silent when he said "no," because the defendant was answering a specific question about whether he understood his rights rather than indicating his desire to curtail questioning. In rejecting the State's argument, we explained that "[t]he fact that his oral response was not accompanied by a stronger oral statement or physical manifestations does not make his response of 'No' any less decisive or clear." *Id.* at 997. We further rejected the State's efforts to use the defendant's subsequent statements after he said "no" to cast doubt on whether he meant to end his questioning. We explained that the State's assertion that the defendant's response of "No" was based on a misunderstanding of the preceding question was

"merely a possible, as well as a convenient, interpretation based upon the State's own 'clarification' through a series of subsequent questions which were amenable to the possibility of manipulation of the wording of those questions to obtain the desired 'clarification.' The fact remains, however, that defendant stated that he did not want to talk to the assistant State's Attorney and clearly indicated so based on his response 'No' to the State's corresponding question. Questioning should have ceased at that point ***." *Id.* at 998.

¶ 52    We find the facts of this case analogous to those in *Flores*, *Hernandez,* and *Brown*. As in

those cases, we find that when Cox stated "I don't wanna answer no more questions, 'cause I can't help you. And I don't wanna dig myself into a hole," he clearly and unequivocally invoked his right to remain silent. Questioning should have ceased. And it did for a period of time. No additional questions were asked of Cox until almost four hours later when detectives reinitiated the interview.

¶ 53    Having concluded that Cox invoked his right to remain silent, we now turn to whether the trial court could properly consider Cox's statements that followed his invocation. Statements obtained after the defendant invokes his right to remain silent may be admissible if the defendant's right to end questioning was "scrupulously honored." *Nielson*, 187 Ill. 2d at 287. In determining whether a defendant's right was "scrupulously honored," we consider whether "(1) the police immediately halted the initial interrogation after the defendant invoked his right to remain silent; (2) a significant amount of time elapsed between the interrogations; (3) a fresh set of *Miranda* warnings were given prior to the second interrogation; and (4) the second interrogation addressed a crime that was not the subject of the first interrogation." *Id.*

¶ 54    While the police immediately halted the initial interrogation when Cox invoked his right to remain silent and a significant amount of time elapsed between the interrogations, Cox was not given a fresh set of *Miranda* warnings prior to the second interrogation. Furthermore, the second interrogation initiated by Detectives Egan and Rios involved the same subject matter as the questioning by Detectives Cato and Velasquez. Accordingly, we find that Cox's right to remain silent was not scrupulously honored and therefore the statements he made after he invoked his right to remain silent are inadmissible.

¶ 55    The State argues that, should we find that Cox invoked his right to remain silent and his

19

subsequent statement inadmissible, such error is harmless. The improper admission of a defendant's statements is indeed subject to harmless error review. *People v. Wilson*, 2020 IL App (1st) 162430, ¶ 57.

¶ 56   The critical question under harmless error analysis is "whether it appears beyond a reasonable doubt that the error did not contribute to the verdict." *Wilson*, 2020 IL App (1st) 162430, ¶ 57 (citing *People v. Patterson*, 217 Ill. 2d 407, 428 (2005)). The admission of unlawfully obtained confessions is "rarely harmless error." *People v. Harris*, 2012 IL App (1st) 100678, ¶ 76. "[I]n determining whether a constitutional error is harmless beyond a reasonable doubt, '[t]he focus should *** be upon the character and quality of the illegally obtained evidence as it relates to the other evidence bearing on the same issue and the court should appraise the possible impact upon the jury of the wrongfully obtained evidence.' " *People v. R.C.*, 108 Ill. 2d 349, 355 (1985) (quoting *People v. Black*, 52 Ill. 2d 554, 555 (1972)).

¶ 57   The State argues that, during the course of Cox's interview prior to his invocation, Cox "admitted to essentially every element of the confession" and therefore any error was harmless. As the State concedes, this portion of the interview was not admitted at trial. We fail to see how evidence that was not before the jury can be used as a basis to establish harmless error. The portion of Cox's statement that was admitted at trial outlining his knowledge of, and involvement in, Roy's shooting was the underpinning of the State's case. Other than Cox's DNA found on the mask near the stolen vehicle, there is no evidence aside from Cox's statement that puts Cox at the scene of the crime or ties him in any way to Roy's murder. We therefore cannot say that the improper admission of Cox's statement was harmless beyond a reasonable doubt. Therefore, Cox should receive a new trial where the videorecorded statement will not be

admitted.

¶ 58    As we are remanding for a new trial, we need not address the remaining issues Cox raises in this appeal. We will address, however, his argument on the sufficiency of the evidence to avoid double jeopardy concerns.

¶ 59    A defendant may not be retried to afford the State another opportunity to present evidence it failed to present in the first trial, but retrial is not precluded "when a conviction has been overturned because of an error in the trial proceedings." *People v. Drake*, 2019 IL 123734, ¶ 20. If, however, the evidence presented during the first trial was insufficient to support a conviction, retrial is not proper. *Id.* "[F]or purposes of double jeopardy all evidence submitted at the original trial may be considered when determining the sufficiency of the evidence." *People v. Olivera*, 164 Ill. 2d 382, 393 (1995). So, even though we have determined that Cox's statement to the police after he invoked his right to remain silent should have been suppressed, we consider it in determining whether the double jeopardy clause forbids a retrial. *People v. Lopez*, 229 Ill. 2d 322, 367 (2008).

¶ 60    Cox challenges the sufficiency of the evidence against him and argues that his "mere presence" at the scene of the shooting is not sufficient to establish his participation in the crime. When reviewing the sufficiency of the evidence in a criminal case, we must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Smith*, 185 Ill. 2d 532, 541 (1999).

¶ 61    We will not reverse a criminal conviction unless the evidence is so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt. *People v.*

*Rowell*, 229 Ill. 2d 82, 98 (2008). A reviewing court does not retry the defendant or substitute its judgment for that of the trier of fact with regard to the credibility of witnesses or the weight to be given to each witness's testimony. *People v. Jackson*, 232 Ill. 2d 246, 281 (2009). Rather, we "carefully examine the evidence while bearing in mind that the trier of fact is in the best position to judge the credibility of witnesses, and due consideration must be given to the fact that the fact finder saw and heard the witnesses." *People v. Herman*, 407 Ill. App. 3d 688, 704 (2011).

¶ 62     Cox was found guilty of first degree murder by way of accountability for acts done with either intent to kill or do great bodily harm, or knowledge that the acts would cause death or create a strong probability of death or great bodily harm. 720 ILCS 5/9-1(a)(1), (2) (West 2014). A defendant may be found guilty on an accountability theory if the State establishes beyond a reasonable doubt that the defendant shared the criminal intent of the principal or that there was a common criminal design. *People v. Fernandez*, 2014 IL 115527, ¶ 13. A defendant's intent may be inferred from the nature of his or her actions and the circumstances surrounding the criminal conduct. *People v. Perez*, 189 Ill. 2d 254, 266 (2000). Words of agreement are not necessary to establish a common purpose to commit a crime, and accountability may be established through a defendant's knowledge of and participation in the criminal scheme, even though there is no evidence that he or she directly participated in the criminal act itself. *Id.* at 267. "One may aid and abet without actively participating in the overt act." *People v. Taylor*, 164 Ill. 2d 131, 140 (1995). "Proof that defendant was present during the perpetration of the offense, maintained a close affiliation with his companions after the commission of the crime, and failed to report the crime are all factors that the trier of fact may consider in determining the defendant's legal accountability." *Id.* at 141.

¶ 63    The totality of the evidence in this case construed in the light most favorable to the State established that Cox committed first degree murder, as he aided the gunmen in the commission of the offense with the intent to promote and facilitate the commission of Roy's murder. Cox admitted in his statement to Detective Cato that he was present at a meeting with Quentin, Raymond, Devonjae, and Anthony to discuss the plan to exact revenge on Roy for killing Sherelle. The group talked about "stealing a car and proceeding to shoot Roy Williams." The next day, members of the group stole a van, and when they pulled up to Cox, someone asked, "[W]e finna go down on this n***a, for killing our little homie. You finna come with us?" Although Cox knew this meant that they were going to "get down" on Roy for killing Sherelle, he got into the van with two surgical masks. He kept one and gave one to Devonjae. Cox saw Anthony with a gun. Quentin and Raymond said they had guns, but Cox didn't see them. According to Cox, he later got out of the van near the bus stop. He was given Raymond's cell phone and was instructed to be the lookout and call if he saw Roy. Moreover, a surgical mask with a "major DNA profile" attributable to Cox was recovered near the stolen van that police discovered near Roy's stepmother's house with the engine still running. Deandre stated that the first shooter had a surgical mask on, and the second shooter had a surgical mask on, but it was not covering his face. Cox never reported the shooting to the police.

¶ 64    As the evidence presented at trial was sufficient to establish that Cox was guilty of murder on a theory of accountability beyond a reasonable doubt, his retrial on these charges presents no double jeopardy impediment. Again, this finding is only for purposes of double jeopardy, and we reach no conclusions as to Cox's guilt that are binding on retrial. *People v. Naylor*, 229 Ill. 2d 584, 610-11 (2008).

¶ 65          CONCLUSION

¶ 66 For the foregoing reasons, we reverse the judgment of the circuit court and remand for a new trial.

¶ 67 Reversed and remanded.

*People v. Cox*, **2023 IL App (1st) 170761**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 12-CR-18935; the Hon. Michael B. McHale, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Patricia Mysza, and Christopher L. Gehrke, of State Appellate Defender's Office (Julia Ozello, law student), of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Matthew Connors, and Tyler J. Cox, Assistant State's Attorneys, of counsel), for the People. |