FIRST DIVISION

August 24, 1998

Nos. 1-97-1886 & 1-97-2276; Cons.

THE PEOPLE OF THE STATE OF ILLINOIS, )  Appeal from the

)  Circuit Court of

Plaintiff-Appellee, )  Cook County.

)

v. )  No. 95 CR 32846

)

TERRELL SHIELDS AND DERON BAGGETT, )  Honorable

)  James D. Egan,

Defendants-Appellants. )  Judge Presiding.

JUSTICE O’BRIEN delivered the opinion of the court:

Following a joint bench trial, defendant, Terrell Shields, was convicted of attempted first degree murder, aggravated battery with a firearm, armed violence and three counts of aggravated battery.  Defendant, Deron Baggett, was convicted of attempted first degree murder, aggravated battery with a firearm, armed violence and two counts of aggravated battery.  Defendant Shields was sentenced to a 21-year prison term for attempted first degree murder, to be served concurrently with a 21-year sentence for armed violence, with which the three aggravated battery counts were merged for sentencing purposes.  Defendant Baggett was sentenced to an 18-year prison term for armed violence, to be served concurrently with an 18-year sentence for attempted first degree murder.  His convictions for aggravated battery with a firearm and two counts of aggravated battery were merged with the attempted murder conviction for sentencing purposes.  Defendants contend upon appeal that the State failed to prove beyond a reasonable doubt they did not act in self-defense.  They also contend the trial court erred in sentencing them for armed violence predicated upon aggravated battery, because the 15-year minimum term for that offense is unconstitutionally disproportionate to the 6-year minimum term  for aggravated battery with a firearm, although the two offenses are virtually identical.  Finally, defendant Baggett contends that his 18-year sentence is excessive and should be reduced.

At trial, Dennis Johnson testified that on March 31, 1995, at approximately 11 p.m., he and his friend James Brown were parked in the lot between a liquor store and a motorcycle club on the 5700 block of West Madison Street in Chicago.  Johnson went into the liquor store to buy liquor while Brown remained near the car talking on a cellular telephone.  After Johnson came out of the liquor store, he saw Kennith Boston enter the parking lot.  At approximately 11:30 p.m., defendants entered the parking lot from the direction of the motorcycle club.  They walked over and spoke to Boston.  Baggett told Shields, "Up the thing, shoot them niggers," and Shields fired in the direction of Johnson and Brown, who jumped behind Brown's car.  Brown looked up to see whether they were still shooting, and was wounded in the right temple, blinding him.  Johnson put Brown in the car and drove him to the hospital.  He did not see Brown with a weapon on the night of the incident and did not carry one himself.  Johnson told police officers during an interview that he recognized Baggett as the man who had robbed him several months earlier, but he never made a police report at the time of the robbery.  Johnson testified that both he and defendant Baggett were members of the Vice Lords street gang, but that Brown was not.  Johnson later identified both defendants in separate lineups.

James Brown testified that when he heard the words, "Up the thing, shoot them niggers," he ran and ducked behind a car.  He heard several shots being fired before he looked up from behind the car and was hit in the temple.  Brown testified that before the shooting he had had no arguments or conflicts with Baggett.  On the night of the shooting he did not consume any alcohol, and Johnson had one drink.

Chicago Police Officer, Jeffrey Coleman, testified that, on the night of the shooting, he arrived at the parking lot at approximately 12:20 a.m.  There were no civilians at the scene and no one approached him about a shooting at that location.  A gray, four-door car with shattered windows was in the lot.  There was blood on the car, and an expended casing in the driver's side.  Officer Coleman searched for weapons but did not find any.  After several minutes, he called to verify the location and was told the victim was at the hospital.  Officer Coleman waited for other officers to arrive to secure the scene before going to the hospital.  At the hospital, Officer Coleman spoke to Dennis Johnson, who said that he and James Brown had been drinking in the parking lot before the shooting.  Shields and Baggett, who had robbed Johnson sometime earlier, came to the parking lot where an altercation between them ensued that resulted in Brown being shot.

Chicago Police Officer, Patrick Moran, testified that he was assigned to process the crime scene, arriving at approximately 4:10 a.m.  He observed a silver Ford with blood on the door and shattered windows.  He collected a metal fragment that was similar to a fired bullet on the ground near a bullet hole in the front bumper.  On the floor of the driver's side of the car was broken glass and an expended bullet.  Officer Moran then searched the area surrounding the vehicle and found a cartridge casing approximately 30 feet away from the car.  He also searched two garbage cans that were in the lot, but he did not empty them completely and could not see to the bottom of the cans.

Kennith Boston, testifying for the defense, stated that approximately 20 people were in the parking lot when he first saw Dennis Johnson and James Brown.  Both Johnson and Brown were drinking.  When defendants entered the parking lot from the gas station across the street, Boston heard a "clack, clack" sound that he recognized as a bullet being chambered in a gun.  He turned around, saw James Brown holding a gun and heard him say, "What's up, bitch?"  Brown then fired the gun toward Baggett and Joseph Tate, who was standing near Baggett and Boston.  Baggett said, "Up them things," and Boston heard shots from another direction.  Shields was approximately 30 feet away, near the liquor store.  Boston heard shots from approximately four guns.  He jumped into a truck, looked around, and saw Johnson put Brown into the car and pick up a chrome 9 millimeter gun.  Boston testified he was still in the parking lot when the police arrived, and that he spoke with a police officer.  Shields was also in the parking lot when the police arrived.  Boston never saw Shields with a gun.

Boston testified he had known Baggett for 10 years, and that his uncle had a relationship with Baggett's mother.

Joseph Tate testified that on the night of the shooting he was in the parking lot with Baggett and a boy named Eddie.  Tate was wearing a blue and red Starter jacket identical to one that Baggett was wearing.  Tate heard James Brown say loudly, "What's up, bitch?" and then heard the sound of a bullet being chambered into a gun.  Tate turned around, heard a shot, then ran and ducked between cars.  A bullet grazed his arm, and he went to the hospital later to receive treatment.  He heard at least three different guns being fired and saw the window of a car broken.

Clayton Rainey testified that on July 17, 1994, at approximately 11:30 p.m., James Brown drove by Rainey at the 5300 block of Congress Parkway and told him to leave the corner.  Brown drove away and then returned, jumped out of the car and struck Rainey in the back with a gun.  Rainey called the police, who stopped the car and recovered the gun.

The parties stipulated that if Sergeant Nigro were called upon to testify, he would state that on July 17, 1994, he met with Clayton Rainey and toured the area until Nigro stopped a car driven by James Brown and recovered a gun from the car.

The parties also stipulated that if Detective Salemme were called upon to testify, he would state that James Brown told him he was a member of the Vice Lords and that Brown recognized Baggett as the man who robbed him at gunpoint in the summer of 1994.

In rebuttal, Chicago Police Officer, Don Vasquez, testified that at approximately 11:40 p.m., on March 31, 1995, he and his partner, Officer Robert Martin, spoke to Joseph Tate at the hospital.  Tate told them he was injured while he was across the street from the parking lot.

The trial court found defendants guilty on all counts.  Defendant Shields received a 21-year sentence for attempted first degree murder, to be served concurrently with a 21-year sentence for armed violence, aggravated battery with a firearm and three aggravated battery counts.  Defendant Baggett was sentenced to an 18-year prison term for armed violence, to be served concurrently with an 18-year sentence for attempted first degree murder, aggravated battery with a firearm and two counts of aggravated battery. 

Defendants' first contention upon appeal is that the State failed to prove beyond a reasonable doubt they did not act in self-defense.  A defendant may assert the affirmative defense of defense of person when unlawful force was threatened against him or the person he was defending, defendant was not the aggressor, defendant believed that danger of harm was imminent, the use of force was necessary to avert the danger, and the amount of force used was appropriate.  
People v. Batac
, 259 Ill. App. 3d 415, 428 (1994).  The defense can only be raised if defendant presents some evidence regarding each element.  
People v. Greene
, 160 Ill. App. 3d 1089, 1096-97 (1987).  Once the issue is raised, the State must prove beyond a reasonable doubt that defendant did not act in self-defense.  Only one element need be negated.  
Greene
, 160 Ill. App. 3d at 1096.  "The issue of self-defense is determined by the trier of fact.  If the trier of fact has determined that the State has negated beyond a reasonable doubt any one of the elements justifying the use of force, then the State has carried its burden of proof.  [Citations.]  The trier of fact's decision on the issue of self-defense will not be disturbed on review unless the decision is so improbable or unsatisfactory as to raise a reasonable doubt of the defendant's guilt."  
Greene
, 160 Ill. App. 3d at 1096.  

In this case, defendants contend they were justified in shooting at Brown because he was the initial aggressor.  Assuming defendants presented some evidence of each element of self-defense, the State need negate only one element beyond a reasonable doubt.  Defendants presented evidence that both Kennith Boston and Joseph Tate heard Brown say, "What's up, bitch?" and shoot in their direction.  Boston and Tate also testified that they heard shots from three or four different guns.  However, both Brown and Johnson testified defendants shot at them without provocation, and that they ran and ducked between cars when the shooting began.  The only bullets recovered from the scene were found in and around the car near where Brown and Johnson hid.  The car's windows were shattered and there was blood on the door.  

It is within the province of the trier of fact to make determinations of credibility, and the weight and inferences to be drawn from the evidence.  
People v. Steidl
, 142 Ill. 2d 204, 226 (1991).  A reviewing court will not reverse the findings of the trier of fact if, when viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt.  
Jackson v. Virginia
, 443 U.S. 307, 318-19, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2788-89 (1979).  In this case, it was well within the trial court's discretion to believe the testimony of Brown and Johnson in combination with the physical evidence, rather than the testimony of Boston and Tate.  We will not disturb the trial court's determination that the State negated beyond a reasonable doubt the claim that defendants' use of force was justified because Brown was the initial aggressor.

Defendants next contend their armed violence convictions, predicated upon aggravated battery, should be vacated because their sentences for that offense were unconstitutionally disproportionate to the sentences they could have received for their convictions of aggravated battery with a firearm.  

Defendants argue this case is analogous to 
People v. Lewis
, 175 Ill. 2d 412, 418 (1996), in which the Illinois Supreme Court held that the penalty for armed violence predicated upon robbery committed with a category I weapon violated the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, §11).  The court held that in such an instance, the State's Attorney has no authority to even charge armed violence.  
Lewis
, 175 Ill. 2d at 423.  Armed violence is defined as the commission of any felony while armed with a dangerous weapon.  720 ILCS 5/33A-2 (West 1994).  The commission of any felony with a category I weapon, such as a handgun, is a Class X offense with a penalty from 15 to 30 years.  720 ILCS 5/33A-3(a) (West 1994).  Robbery while armed with a handgun constitutes armed robbery, a Class X offense with a penalty of 6 to 30 years.  730 ILCS 5/5-8-1(a)(3) (West 1994).  The court found the two offenses substantially identical, but punishable by unconstitutionally disparate penalties. 

In this case, defendants contend that armed violence predicated upon aggravated battery has substantially identical elements as aggravated battery with a firearm.  Aggravated battery is defined as intentionally or knowingly causing great bodily harm or permanent disability or disfigurement while committing a battery.  720 ILCS 5/12-4(a) (West 1994).  Aggravated battery with a firearm is knowingly or intentionally by means of discharging of a firearm causing injury to another person while committing a battery.  720 ILCS 5/12-4.2(a) (West 1994).  Armed violence is the commission of any felony while armed with a dangerous weapon.  A person is considered armed with a dangerous weapon when he carries on or about his person or is otherwise armed with a category I, category II, or category III weapon.  A handgun is a category I weapon.  720 ILCS 5/33A-1(a), (b) (West 1994).  

The penalty for armed violence with a category I weapon is a minimum of 15 years (720 ILCS 5/33A-3(a) (West 1994)), while the penalty for aggravated battery with a firearm is from 6 to 30 years (720 ILCS 5/12-4.2(b) (West 1994)).  The standard of review in determining whether a penalty violates the proportionate penalties clause is whether the penalty is cruel or degrading, or so disproportionate to the offense committed as to shock the moral sense of the community.  
People v. Hickman
, 163 Ill. 2d 250, 259-60 (1994).  "Where a comparison of different offenses is at issue, a penalty 'violates the proportionate penalties clause where conduct that creates a less serious threat to the public health and safety than other conduct is punished more harshly.'"  [Citations.]  
People v. Davis
, 177 Ill. 2d 495, 502 (1997). However, "the availability of different punishments for separate offenses based on the commission of the same acts does not offend the constitutional guarantees of equal protection or due process. [Citations.]  The legislature has broad power to create offenses and prescribe penalties."  
People v. Wade
, 131 Ill. 2d 370, 379 (1989).

Although similar, the elements of aggravated battery with a firearm and armed violence predicated upon aggravated battery are not identical.  Each offense contains an element that the other does not.  Aggravated battery with a firearm requires that injury be caused by the discharge of a firearm, while armed violence based upon aggravated battery requires only that a person

be armed with a dangerous weapon somewhere on, or about his person while causing great bodily harm, or, permanent disfigurement, or, disability.  
We cannot say the legislature's determination that a greater penalty should be imposed for armed violence with a category I weapon than for aggravated battery with a firearm is so disproportionate as to shock the moral sense of the community.  The penalties for aggravated battery with a firearm and armed violence predicated upon aggravated battery are not unconstitutionally disproportionate therefore, we find no basis upon this ground for reversal of defendants' convictions and sentences.

Finally, defendant Baggett contends the trial court abused its discretion in sentencing him to concurrent 18-year prison terms for armed violence and attempted first degree murder, aggravated battery with a firearm and aggravated battery, because Baggett was only 17 years old at the time of the shooting, had no prior felony convictions, and did not fire any shots.  

The 1993 amendment to section 5-8-1(c) of the Unified Code of Corrections requires a defendant to file a written post-sentencing motion in the trial court to preserve sentencing issues for appellate review.  730 ILCS 5/5-8-1(c)(West 1994); 
People v. Reed
, 177 Ill. 2d 389 (1997).  Defendants failed to do so, but did make an oral motion to reduce sentence without objection by the State.

Defendants argue that failure to file a written postsentencing motion should be treated the same as a failure to file a written posttrial motion.  Failure to raise an issue in a written motion for a new trial results in waiver of that issue upon appeal.  
People v. Enoch
, 122 Ill. 2d 176, 186 (1988).  However, "[i]t has been held that the requirement of a written motion can be waived if a defendant makes an oral motion for a new trial and the State does not object.  The defendant may then avail himself of any ground for a new trial which might appear in the record."  
Enoch
, 122 Ill. 2d at 188.  "Exceptions to the waiver rule have been recognized where the defendant seeks review of constitutional issues which have properly been raised at trial and which can be raised later in a post-conviction proceeding, where the challenge attacks the sufficiency of the evidence, or where there is plain error."  
People v. Lighthall
, 175 Ill. App. 3d 700, 705 (1988).  

The State argues that under 
People v. Reed
 there is no provision for waiver of the written postsentencing motion requirement.  However, the Illinois Supreme Court also stated in 
Reed
 that "the plain language now contained in section 5-8-1(c) shows a clear legislative intent to make a postsentencing motion the functional equivalent of a posttrial motion for purposes of preserving issues for appeal."  
Reed
, 177 Ill. 2d at 394.  Therefore, we conclude that if defendants allege plain error in sentencing, or if defendants orally move to reduce their sentences without objection to this procedure by the State, the reviewing court may address such issues upon appeal despite defendants' failure to file a written postsentencing motion.

Waiver aside, we find no abuse of discretion.  The sentence imposed by the trial court will not be disturbed absent an abuse of discretion.  
People v. Streit
, 142 Ill. 2d 13, 19 (1991).  A sentencing judge is presumed to have considered all relevant factors absent a contrary showing in the record.  
People v. Back
, 239 Ill. App. 3d 44, 80 (1992).  The trial court is not required to detail for the record the process by which it concluded that the penalty imposed was appropriate.  
People v. Boclair
, 225 Ill. App. 3d 331, 335 (1992).
  Although age may be a relevant mitigating factor, it must be considered in combination with other mitigating and aggravating factors, including the nature and circumstances of the crime, the defendant's conduct in the commission of the crime, and the defendant's personal history, demeanor, credibility, criminal history, general moral character, social environment, and education.  
Back
, 239 Ill. App. 3d at 80.
  In this case, the trial court properly exercised its discretion in sentencing defendant Baggett to an 18-year term.

Accordingly, the judgments of the circuit court are affirmed.  As part of our judgment, we grant the State's motion and assess defendants $100 as costs for this appeal.

Affirmed.

BUCKLEY, P.J., and GALLAGHER, J., concur.