2023 IL App (1st) 210919

SECOND DIVISION
June 6, 2023

No. 1-21-0919

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit |
| | ) | Court of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 14 CR 1651402 |
| | ) | |
| JOHNNY REESE, | ) | Honorable |
| | ) | Alfredo Maldonado, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE HOWSE delivered the judgment of the court.
Justices Ellis and Cobbs concurred in the judgment.

ORDER

¶ 1   *Held*: The judgment of the circuit court of Cook County is affirmed in part, reversed in part, and the cause is remanded for resentencing; the evidence was sufficient to prove beyond a reasonable doubt that defendant was accountable for the acts of the shooter who killed the bystander, that the shooter did not act in self-defense of himself or defendant, and that defendant's convictions on indictments for separate victims do not merge; defendant's *Brady* claim is premature; and the trial court improperly merged defendant's convictions with a conviction for attempt (first degree murder) requiring vacating that conviction and remanding for resentencing on the unsentenced convictions.

¶ 2   The State charged defendant, Johnny Reese, with numerous charges on a theory of accountability for the shooting death of Summer Moore. Moore was an unintended target who was shot and killed by defendant's co-defendant, Marsharra Tate, when Marsharra fired shots in

an attempt to shoot Dominic Newsome. Following a bench trial, the circuit court of Cook County found defendant guilty of first degree murder of Summer Moore based on an intent to kill Summer Moore (count I), a strong probability of death of Summer Moore (count II), and killing Summer Moore during the commission of a forcible felony (counts III, V, and VI). The forcible felonies charged in the indictment were attempt (first degree murder) of Dominic Newsom (count III), aggravated discharge of a firearm against Dominic Newsom (count V) and aggravated discharge of a firearm against Marquez Harris (count VI). The trial court also found defendant guilty of attempt (first degree murder) of Dominic Newsom (by shooting at Newsom) (count LXI) and aggravated discharge of a firearm against Dominic Newsom (counts LXV and LXVII), and Marquez Harris (counts LXVI and LXVIII). The court merged counts I, II, V, VI, and LXI into count III and merged counts LXV, LXVII and LXVIII into count LXVI, and sentenced defendant to an aggregate term of 50 years' imprisonment.

¶ 3     For the following reasons, we affirm the trial court's judgment in part, reverse in part, and remand for resentencing.

¶ 4                                  BACKGROUND

¶ 5     The State alleged that Marsharra Tate (Marsharra), a codefendant in this case who is not a party to this appeal, fired gunshots at Dominic Newsom and Marquez Harris as Newsom and Harris sat in a vehicle. When Marsharra fired at Newsom and Harris, Marsharra was a passenger in a vehicle being driven by defendant. Newsom, who was Marsharra's intended target, admitted that on the day of the shooting he intended to shoot and kill defendant. At trial, defendant claimed self-defense.

¶ 6     The evidence was that defendant had "loaned" Newsom drugs and that Newsom would pay defendant for the drugs at a later date. Defendant testified that he gave approximately $70

2

worth of cocaine to Newsom and Newsom did not pay defendant for it. On the day in question defendant and Marcus Tate (Marcus) (codefendant Marsharra's brother) were driving around. They drove past Newsom sitting on a porch at a residence on Aberdeen Street just north of 113th Place four times. Defendant gave Newsom a "mean" look each time he drove past. Defendant later testified on cross-examination that on the day of the shooting he and Newsom were not getting along because defendant had become involved with Newsom's girlfriend. After the fourth time defendant and Marcus drove past where Newsom was sitting, Newsom's cousin, Marquez Harris, arrived, and Newsom got into Harris's vehicle. Newsom was armed with a handgun.

¶ 7      Harris drove around the corner to just south of 113th Place and Carpenter where they saw defendant's vehicle behind them on Carpenter. Newsom approached defendant's vehicle with a gun in his hand. Newsom testified he intended to shoot defendant because he felt threatened by defendant, but Newsom did not point the gun at defendant at that time. Defendant later testified that he saw Newsom standing near the intersection of 113th Place and Carpenter with a gun in his hand. Defendant reversed his vehicle on Carpenter. Defendant then proceeded forward on Carpenter and picked up Marsharra. Defendant testified that when Marsharra got in the vehicle, Marcus specifically told Marsharra that Newsom "pulled a gun on us."

¶ 8      Defendant testified he saw Newsom proceed south on Carpenter but that he was not really watching where Newsom was going. In a statement taken by police, Marcus stated that he saw Newsom enter a vehicle and proceed south on Carpenter and then make a right turn (west) on the next street.

¶ 9      Defendant testified that Marcus called for Marsharra. In a statement to police Marcus said that defendant called someone after he backed the vehicle up on Carpenter, and defendant then

proceeded in the right direction south on Carpenter then pulled over to pick up Marsharra. Defendant testified that after Marsharra got into the vehicle, defendant drove in the direction of a park to get out of the area. Defendant denied ever pursuing Newsom's vehicle. Defendant admitted that after Marsharra got in the vehicle, he turned right onto 113th Place from Carpenter and defendant was traveling back toward Aberdeen, "which is the street where [defendant] had seen [Newsom] a few minutes earlier." (Defendant was also traveling in the direction of a park.[1]) Defendant testified that after he saw Newsom with a gun he did not return home.

¶ 10    Defendant testified that just as he arrived at the intersection of 113th Place and Aberdeen he heard shots and ducked down. Defendant testified he did not actually stop at the intersection because he heard shots. Defendant heard the shots hitting the right side of his vehicle. Defendant then heard shots by Marsharra coming from his vehicle. Defendant agreed that surveillance video shows his vehicle stop, move forward, and stop again, even though he could have continued in any direction out of the intersection where he was being shot at. Defendant testified he decided to stop in the middle of that intersection because he did not know who was shooting at that time (except for Marsharra).

¶ 11    Newsom testified that prior to the shooting, when Newsom first confronted defendant's vehicle with a gun held to his side, a woman on the street yelled at Newsom to "wait" and Newsom put his gun away and returned to Harris's car. Newsom and Harris began to drive back to the address where they had come from. Newsom testified that as Newsom and Harris approached the intersection of 113th Place and Aberdeen, defendant's vehicle "came and cut off the intersection." Newsom and Harris were driving down Aberdeen and Newsom saw defendant's vehicle traveling on 113th Place in front of them. Harris stopped their vehicle

---

[1]    According to Google maps.

"[a]bout 100 feet" away from the intersection. Newsom saw the back door of defendant's vehicle open and shots being fired. Newsome testified that defendant's vehicle positioned itself to block Newsom and Harris's ability to pull through the intersection.

¶ 12    In his statement, which was admitted into evidence, Marcus stated that as defendant drove on 113th Place approaching the intersection of 113th Place and Aberdeen defendant stated "There they go now." Marcus testified that he saw the vehicle Newsom was in approaching 113th Place from the south on Aberdeen. Marcus stated defendant "stopped the [vehicle] kind of in the intersection of Aberdeen and 113th Place but [defendant] was not blocking the whole intersection." Defendant stopped in the intersection, Marsharra opened the rear door of the vehicle, and Marsharra started firing in Newsom's direction. Defendant then drove away, stopped the vehicle a couple of blocks away, and the passengers all left in different directions. Defendant testified that after the incident he sold the vehicle the following weekend.

¶ 13    Defendant testified he did not know that Marsharra had a gun. Defendant admitted that he told detectives that when Marsharra got in the vehicle defendant saw Marsharra waving the gun around in the car before any shooting. Defendant was asked if he told police that when Marsharra got into the vehicle, Marsharra said "We got to stop this. We've got to squash this." Defendant agreed he did say that to police. Defendant was also asked if he told police that as defendant drove down 113th Place toward Aberdeen, Marsharra said "stop, stop, stop" then defendant stopped the vehicle. Defendant agreed he did say that to police. At trial defendant testified that both times he was lying to police. The State played defendant's videotaped statement for the trial court. Newsom testified that when the shooting occurred, Newsom did not display or fire at defendant's vehicle. Newsom identified defendant and Marsharra.

¶ 14    Summer Moore was standing outside in the area. A bullet from Marsharra's gun struck and killed Summer Moore.

¶ 15    In making its oral ruling the trial court said, in part:

"[Newsom,] of all the baggage he had, and his role in this absolute tragic event, his words about having a gun and intending to use it, but not to use it because of other people out there, rings absolutely true. On that he's absolutely believable.

Marcus Tate whose testimony was 'disgusting' *** his demeanor was of very poor quality *** but it is consistent with the people who were out there that day ***. ***

The video that I saw that was introduced, ***. It's absolutely clear that the car that [defendant] drove when he drove that car—he stopped, gunfire, pulled up, gunfire again—those actions are absolutely, clearly indicative of someone supporting, aiding, and abetting someone who is shooting.

* * *

It does seem to me, based on the evidence and everything that I've heard, that it's just unreasonable to believe that there was no interaction, no conversation in that car. But moreover, by the way that [defendant] drove that car, his actions in the way that he drove that car, the direction he drove that car, the manner he drove that car, his actions, speak louder than anyone's words. And I do find that there was action by [defendant] in support of [Marsharra.]"

¶ 16    As previously stated the trial court found defendant guilty of first degree murder of Summer Moore based on an intent to kill Summer Moore (count I), a strong probability of death

of Summer Moore (count II), and killing Summer Moore during the commission of a forcible felony (counts III, V, and VI). The forcible felonies charged in the indictment were attempt (first degree murder) of Dominic Newsom (count III), aggravated discharge of a firearm against Dominic Newsom (count V) and aggravated discharge of a firearm against Marquez Harris (count VI). The trial court also found defendant guilty of attempt (first degree murder) of Dominic Newsom (by shooting at Newsom) (count LXI) and aggravated discharge of a firearm against Dominic Newsom (counts LXV and LXVII), and Marquez Harris (counts LXVI and LXVIII). The court merged counts I, II, V, VI, and LXI into count III and merged counts LXV, LXVII and LXVIII into count LXVI, and sentenced defendant to an aggregate term of 50 years' imprisonment.

¶ 17    This appeal followed.

ANALYSIS

¶ 18    Defendant argues his convictions for first degree murder, attempt (first degree murder), and aggravated discharge of a firearm must be reversed because (1) the conviction for attempt (first degree murder) of Newsom cannot serve as the predicate felony for defendant's conviction for first degree murder on a theory of felony murder; (2) the conviction for first degree murder cannot stand on a theory of accountability for Marsharra's act of shooting at Newsom, which resulted in shooting Summer Moore, because the State failed to adduce evidence defendant intended to aid Marsharra in shooting at Newsom or of any agreement between them; (3) the conviction for first degree murder must be reversed or reduced to second degree murder because the State failed to prove Marsharra was not acting in self-defense, reasonably or unreasonably; (4) the convictions must be reversed because the State failed to disclose exculpatory evidence to defendant; and (5) the conviction for aggravated discharge of a firearm must merge with the

7

conviction for first degree murder. We address each argument, in turn as is necessary to resolve defendant's appeal.

¶ 19                    FELONIOUS INTENT and FELONY MURDER

¶ 20    Defendant argues that his conviction for attempt (first degree murder) of Newsom cannot serve as the predicate felony for the conviction for felony murder of Summer Moore because the shooting of Summer Moore does not have an independent felonious purpose from shooting at Newsom. The State agrees. The issue as to whether aggravated battery with a firearm constitutes a proper predicate felony in this case is one of law, which we review *de novo*. See *People v. Space*, 2018 IL App (1st) 150922, ¶ 43.

¶ 21    Our supreme court has held that "where the acts constituting forcible felonies arise from and are inherent in the act of murder itself, those acts cannot serve as predicate felonies for a charge of felony murder." *People v. Morgan*, 197 Ill. 2d 404, 447 (2001). "[A] general verdict finding a defendant guilty of murder, where the defendant was charged with intentional, knowing, and felony murder, raises the presumption that the jury found the defendant committed the most serious crime alleged, intentional murder. [Citation.]" *People v. Morgan*, 197 Ill. 2d at 448.

¶ 22    We agree with defendant and the State that the shooting of Summer Moore lacked an independent felonious purpose from shooting at Newsom, which directly resulted in shooting Summer Moore. Therefore, we find that the aggravated discharge of a firearm at Newsom cannot serve as the predicate felony for the felony murder of Summer Moore. See *People v. O'Neal*, 2016 IL App (1st) 132284, ¶ 58. But the State charged, and the trial court convicted, defendant of first degree murder of Summer Moore based on an intent to kill Summer Moore (count I), and a strong probability of death of Summer Moore (count II). "In this case then, we must presume

that the jury found [the defendant] guilty of the most serious crime alleged, intentional or knowing murder." *Morgan*, 197 Ill. 2d at 448. This court has held that where the "defendant was charged with intentional murder, knowing murder, and felony murder, and the proof was applicable to both intentional murder and knowing murder, vacating the felony murder conviction does not affect the intentional murder conviction." *People v. LaRue*, 298 Ill. App. 3d 89, 92 (1998) (citing *People v. Cardona*, 158 Ill. 2d 403, 411 (1994)).

¶ 23     We find that the proof in this case was applicable to both intentional murder and knowing murder. See *People v. Ford*, 2021 IL App (5th) 170259, ¶ 32 (affirming sentence for first degree murder where the defendant fired a gun from a moving vehicle toward a community center where people were standing outside and one of the bullets fired by the defendant struck and killed an innocent bystander); *People v. Doolan*, 2016 IL App (1st) 141780, ¶ 51 ("[a] voluntary and willful act having the natural tendency to cause death or great bodily harm is evidence of an intentional act rather than recklessness" (citing *People v. Kibayasi,* 2013 IL App (1st) 112291, ¶ 42)); *People v. Ruiz*, 342 Ill. App. 3d 750, 757 (2003) (affirming conviction for first degree murder where the defendant fired a handgun in the direction of the victim but "the defendant killed the 'wrong guy' ").

¶ 24     Our finding that defendant's conviction for felony murder cannot stand does not affect the convictions for intentional murder. *LaRue*, 298 Ill. App. 3d at 92 (1998) (citing *Cardona*, 158 Ill. 2d at 411). The trial court did not sentence defendant for defendant's convictions on counts I or II. This court retains jurisdiction to remand to the trial court to sentence defendant on the merged but unsentenced convictions where it is clear from the record that the reason the trial court did not sentence defendant on the unsentenced counts is because it erroneously merged those counts. The merged counts are "intimately related" and "dependent upon" the sentenced

count, having arisen from the same act. *People v. Relerford*, 2017 IL 121094, ¶ 73; *People v. Beck*, 2019 IL App (1st) 161626, ¶ 36; *People v. Goodwin*, 2018 IL App (1st) 152045, ¶¶ 61-63.

¶ 25     Therefore, we vacate defendant's conviction and sentence on count III of the indictment and remand for the trial court to resentence defendant on count I or II.

¶ 26                    ACCOUNTABILITY and FIRST DEGREE MURDER

¶ 27     Defendant argues the State failed to prove him guilty beyond a reasonable doubt of first degree murder based on a theory of accountability because the State failed to adduce any evidence to support a conclusion that defendant aided, abetted, or agreed with Marsharra in shooting at Newsom, or that they had a common criminal design, or that they shared an intent to shoot at Newsom. We disagree. We find the evidence adduced at trial, and the reasonable inferences based thereon, are sufficient for a reasonable finder of fact to find defendant guilty beyond a reasonable doubt of all of the elements of first degree murder of Summer Moore based on a theory of accountability.

¶ 28     Defendant challenges the sufficiency of the evidence to prove him guilty of first degree murder based on a theory of accountability for Marsharra's conduct. When reviewing the sufficiency of the evidence, the standard of review is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. [Citation.]" *People v. Jones*, 2023 IL 127810, ¶ 28. We do not substitute our judgment for the judgment of the trier of fact on questions involving the weight of the evidence or the credibility of witnesses. *Id.*

> "It is the responsibility of the trier of fact to resolve conflicts in the
> testimony, weigh the evidence, and draw reasonable inferences from the facts.
> [Citation.] [T]he trier of fact is not required to disregard inferences which flow

normally from the evidence and to search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt. [Citation.] [I]n a bench trial it is the province of the trial court to determine the credibility and weight of the testimony, to resolve the inconsistencies and conflicts therein, and to render its decision accordingly. [Citation.]" (Internal quotation marks omitted.)

*People v. Galarza*, 2023 IL 127678, ¶ 25.

All reasonable inferences from the evidence must be drawn in favor of the conviction. *Jones*, 2023 IL 127810, ¶ 28. "[A] trier of fact is free to accept or reject as much or as little as it pleases of a witness's testimony." *People v. Walls*, 2022 IL App (1st) 200167, ¶ 29. "A criminal conviction will not be overturned unless the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *Id.*

¶ 29    A person is legally accountable for the conduct of another that constitutes a crime when "either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense. 720 ILCS 5/5-2(c) (West 2016)." *People v. Mulosmani*, 2022 IL App (1st) 200635, ¶ 66. If two or more persons engage in "a common criminal design or agreement," any acts done by either one in the furtherance of that common design committed are considered to be the acts of all parties to the common design or agreement "and all are equally responsible for the consequences of those further acts. [Citation.]" 720 ILCS 5/5-2(c) (West 2022), *Mulosmani*, 2022 IL App (1st) 200635, ¶ 66. A defendant may also be found guilty on an accountability theory if the State establishes beyond a reasonable doubt that the defendant shared the criminal intent of the principal. *Cox*, 2023 IL App (1st) 170761, ¶ 62. Intent may be inferred from the nature of the defendant's actions and the circumstances surrounding the criminal

conduct. *Id*. "Words of agreement are not necessary to establish a common purpose to commit a crime, and accountability may be established through a defendant's knowledge of and participation in the criminal scheme, even though there is no evidence that he or she directly participated in the criminal act itself." *Id*. Furthermore, "[o]ne may aid and abet without actively participating in the overt act. [Citation.]" *Cox*, 2023 IL App (1st) 170761, ¶ 62. The trier of fact may consider evidence that the defendant was present during the perpetration of the offense, the defendant's flight from the scene, and that the defendant failed to report the crime in determining the defendant's legal accountability. *Id*.

¶ 30    Defendant argues the only evidence that could be considered probative of his guilt are (a) the video surveillance footage of the shooting that appears to show defendant's vehicle pulling up to permit Marsharra to shoot then moving forward to permit Marsharra to continue shooting—which defendant argues is the only evidence upon which the trial court relied—and (b) statements made in the vehicle by defendant to Marsharra informing Marsharra that Newsom had confronted defendant and Marcus while Newsom was holding a gun to his side and later defendant's statement to Marsharra that "there they go" referring to Newsom and Harris.

¶ 31    As to the evidence, we find that defendant simply offers different inferences about what is shown in the video and what was meant by the words spoken in defendant's vehicle before Marsharra shot at Newsom. Unsurprisingly, defendant draws inferences from the facts that are favorable to him. However, in our review, we must take all reasonable inferences in favor of the conviction. See *Jones*, 2023 IL 127810, ¶ 28.

¶ 32    Defendant argues the video does *not* "show the vehicle stopping so shots could be fired, then it moving up so more shots could be fired." Instead, defendant watches the same video and concludes "[i]t appears that the vehicle started to drive away but stopped because the same

12

volley of shots was still being fired from the back. Once the shots stopped, the [vehicle] drove away." We dispute the implicit suggestion that the trial court's inferences are unreasonable. It is reasonable to infer from the evidence that defendant was looking for Newsom when they encountered each other the second time at 113th Place and Aberdeen and it is reasonable to infer that defendant stopped the vehicle so that Marsharra could shoot at Newsom.

¶ 33     Defendant's implicit claims that these inferences are unreasonable in light of all the circumstances fail. Defendant argues that regardless of who spoke in the vehicle before the final confrontation, saying "there they go" (defendant points out conflicting evidence that Marcus made the statement, not defendant), the words spoken "are entirely innocent statements that any reasonable person would make under these circumstances; neither at all suggest that [defendant] was acting to promote or facilitate this shooting." In support of his interpretation of the evidence defendant also argues that the evidence demonstrates conclusively that defendant was never the aggressor in this conflict between defendant and Newsom or that defendant ever had the specific intent to shoot at Newsom. Defendant argues that to conclude otherwise is not a reasonable inference from the evidence but is instead "a reliance upon unsupported speculation that something else must have been going on in [defendant's] head that day."

¶ 34     Regardless whether or not defendant's views are reasonable, the trial court's view is not unreasonable. The State succinctly and aptly argues the following facts adduced at trial demonstrate that the trial court properly convicted defendant of first degree murder, attempt (murder), and aggravated discharge of a firearm on a theory of accountability, which we find to be reasonable and based on the evidence:

> "Defendant showed animosity toward the victim of the attempt murder.
>
> Defendant had a motive to harm the victim of the attempt murder. Defendant

called the shooter. Defendant picked up the shooter. Defendant explained the situation to the shooter. Defendant saw the shooter with a gun. The shooter expressed a desire to end the problems with the attempt murder victim. Defendant blocked in the attempt murder victim. * * *

The shooter tried to shoot the attempt murder victim. The shooter shot in the direction of [Newsom], who was in a car. The shooter shot Summer Moore. Defendant drove himself and the shooter away from the scene. Defendant fled the area. Defendant disposed of his car. Defendant never reported the shooting to the police."

The State also argues the crime does not occur without defendant's actions.

¶ 35   We conclude that, based on the evidence at trial, the trial court could reasonably infer that (1) defendant was the speaker in the vehicle after picking up Marsharra and (2) defendant was circling back to where Newsom could be found—another reasonable inference that supports the conviction and is supported by the evidence of the direction defendant was driving—and defendant informed Marsharra their target was now present and that Marsharra could act on their common criminal design to "squash this." We further note that when defendant stopped his vehicle in the intersection, the evidence was that Newsom's vehicle was still south of the intersection. Therefore, defendant could have continued westbound in the direction of a nearby park, or anywhere else for that matter.

¶ 36   The standard applicable in cases involving a challenge to the sufficiency of the evidence "applies to both direct and circumstantial evidence." *Mulosmani*, 2022 IL App (1st) 200635, ¶ 63. "It is the responsibility of the trier of fact to weigh, resolve conflicts in, and draw reasonable inferences from the evidence." *Id*. See also *People v. Sherman*, 2020 IL App (1st) 172162, ¶ 35

("A trier of fact may infer from facts and circumstances in evidence other connected facts that reasonably and usually follow according to common experience.") Thus, taking the evidence in the light most favorable to the conviction includes making all reasonable inferences from the circumstantial evidence in the State's favor. See *id*.

¶ 37    The fact defendant stopped at 113th and Aberdeen, coupled with all of the evidence favorable to the conviction, is circumstantial evidence that defendant had become the aggressor searching out Newsom with or to aid Marsharra to carry out a criminal design against Newsom. These facts distinguish this case from *People v. Taylor*, 186 Ill. 2d 439 (1999). There, our supreme court held that no rational trier of fact could have found beyond a reasonable doubt that the defendant, either before or during the commission of the offense, aided or abetted the codefendant in the commission of any element of the offense of aggravated discharge of a firearm because the "defendant neither had knowledge that [the codefendant] intended to fire his gun upon exiting the vehicle nor made any effort to aid [the codefendant] in the discharge of the weapon." *Id*. at 448. However, in *Taylor*, there was no evidence of an existing dispute between the shooters and the victim or that the shooters were in pursuit of the victim, as exists in this case. *Id*. at 443-44. We find there is evidence that in this case defendant did aid Marsharra in the commission of an element of the offense by driving Marsharra to and pointing out the presence of the victim, especially after Marsharra stated they had to "squash this" dispute between defendant and Newsom.[2] *Cf. id*.

---

[2] In reply, defendant argues that defendant's recounting of Marsharra's statement is hearsay. The statement is not evidence of the truth of the matter asserted—that for some reason, defendant and Marsharra had to end the dispute with Newsom—the statement is evidence of Marsharra's and defendant's intent when they shot at Newsom and, therefore, is not inadmissible hearsay. *People v. Williams*, 181 Ill. 2d 297, 313 (1998) (a hearsay statement is allowed where it is offered to establish the intent or state of mind of the declarant).

¶ 38    Whether or not there was evidence that defendant told Marsharra to "do anything, or that [Marsharra] suggested to [defendant] that [Marsharra] was going to shoot" is evidence the trier of fact could consider in determining accountability, but is not dispositive. "A common purpose or design may be inferred from the circumstances and need not be supported by words of agreement." *Mulosmani*, 2022 IL App (1st) 200635, ¶ 66. Furthermore, the trier of fact may consider the defendant's flight from the scene and failure to report the crime—both elements that are present in this case—in determining accountability. *Id*.

¶ 39    The circumstances—defendant was involved in a disagreement with Newsom and was giving him mean looks, defendant picked up an armed Marsharra, drove in the direction where Newsom had been seen and pointed out Newsom to Marsharra who opened fire, defendant fled the scene of the shooting with Marsharra and disposed of the vehicle, and defendant did not report the crime himself—can all be construed by a reasonable trier of fact to conclude a common design by defendant and Marsharra and, moreover, that defendant aided Marsharra in implementing that design by driving Marsharra to a location where the design could be put into motion, and that defendant further facilitated the crime by pulling his vehicle forward as Marsharra fired.

¶ 40    We agree with the State that "[d]efendant's invitation to view the evidence in the light most favorable to defendant should be rejected as contrary to Illinois law. All reasonable inferences from the evidence must be drawn in favor of the conviction. *Jones*, 2023 IL 127810, ¶ 28. This court will not overturn a criminal conviction unless the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *Id*. Here, the evidence of defendant's guilt is not unreasonable, improbable, or unsatisfactory. Therefore,

the judgment of the trial court convicting defendant of first degree murder, attempt (first degree murder) and aggravated discharge of a firearm are affirmed.

¶ 41                    SELF-DEFENSE and SECOND DEGREE MURDER

¶ 42    Defendant argues the evidence supports only the conclusion that Marsharra was acting in self-defense of himself, defendant, and Marcus when he shot at Newsom; therefore, defendant should be exonerated or, alternatively, if this court finds Marsharra's belief in the need for self-defense was unreasonable, defendant can only be convicted of second degree murder. We find that the State proved beyond a reasonable doubt that Marsharra did not act in self-defense. We also find that defendant failed to prove by a preponderance of the evidence all of the elements of self-defense and failed to prove beyond a reasonable doubt that Marsharra unreasonably believed the circumstances to be such as would justify or exonerate the killing in this case.

¶ 43    In Illinois "[a] person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he *reasonably* believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." (Emphasis added.)  720 ILCS 5/7-1 (West 2022).

> "Once the issue is raised, the State must prove beyond a reasonable doubt that defendant did not act in self-defense. Only one element need be negated. [Citation.] 'The issue of self-defense is determined by the trier of fact. If the trier of fact has determined that the State has negated beyond a reasonable doubt any

one of the elements justifying the use of force, then the State has carried its burden of proof.' [Citations.]" *People v. Shields*, 298 Ill. App. 3d 943, 947 (1998).

¶ 44    "For completed murders (non-attempts), an unreasonable belief in the need for self-defense mitigates first degree murder to second degree murder but does not result in an outright acquittal." *People v. Jones*, 2021 IL App (1st) 181266, ¶ 66.

"A person commits second degree murder by committing first degree murder with 'the following mitigating factor[ ] *** (2) at the time of the killing he or she believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his or her belief is unreasonable.' 720 ILCS 5/9-2(a) (West 2016). While the State must prove the elements of first degree murder beyond a reasonable doubt, once evidence of a mitigating factor has been presented, 'the burden of proof is on the defendant to prove [a] mitigating factor by a preponderance of the evidence before the defendant can be found guilty of second degree murder.' 720 ILCS 5/9-2(c) (West 2016)." *People v. Rutigliano*, 2020 IL App (1st) 171729, ¶ 76.

¶ 45    "To be guilty of second degree murder based on an unreasonable belief in self-defense, the defendant must prove by preponderance of the evidence that all of the first five elements of self-defense existed, which are as follows: (1) force is threatened against the person, (2) the person threatened is not the aggressor, (3) the danger of harm was imminent, (4) the threatened force was unlawful, and (5) the defendant actually and subjectively believed a danger existed that required the use of force applied." *People v. Mujkovic*, 2022 IL App (1st) 200717, ¶ 26. Nonetheless, "the right of self-defense does not permit one to pursue and inflict injury upon even an initial aggressor after the aggressor abandons the quarrel." *People v. Guja*, 2016 IL App (1st)

140046, ¶ 54 (citing *People v. Holman*, 2014 IL App (3d) 120905, ¶ 58.). The trier of fact's decision on the issue of self-defense will not be disturbed on review unless the decision is so improbable or unsatisfactory as to raise a reasonable doubt of the defendant's guilt. *People v. Shields*, 298 Ill. App. 3d 943, 947 (1998).

¶ 46     The evidence is sufficient to permit the trier of fact to reasonably conclude that the State proved beyond a reasonable doubt that defendant and Marsharra became the aggressors and that the danger of harm from Newsom was not imminent when defendant and Marsharra initiated the fatal shooting. Because the evidence is sufficient to permit the trier of fact to reasonably find that defendant and Marsharra became the aggressors seeking out Newsom (*supra*, ¶ 34), the evidence is sufficient to negate defendant's claim of self-defense. See *Guja*, 2016 IL App (1st) 140046, ¶ 52 ("If the State negates any of these elements, the defendant's claim of self-defense must be rejected.").

¶ 47     Moreover, we will not disturb the decision by the trier of fact in this case that defendant failed to prove by a preponderance of the evidence that the threat of harm was imminent or that Marsharra subjectively believed the circumstances required the use of force he applied. *Shields*, 298 Ill. App. 3d at 947. The evidence is sufficient to permit the trier of fact to reasonably conclude that defendant drove in the direction of travel Newsom had taken and stopped his vehicle when he spotted Newsom.

¶ 48     Defendant argues that the history of Newsom's aggression toward defendant must be ignored not to find self-defense. We disagree. Even if Newsom presented an ongoing threat to defendant, Marsharra's shooting at Newsom at a time when Newsom was sitting in his vehicle, not brandishing his weapon, and stopped only because defendant effectively stopped him by blocking the intersection with his vehicle, "can only be considered an act of revenge, rather than

a legally justifiable use of force in self-defense." *Holman*, 2014 IL App (3d) 120905, ¶ 59. Here, as in *Holman*, the evidence fails to prove by even a preponderance of the evidence that at the time Marsharra shot at Newsom, anyone in defendant's vehicle was "in danger of serious injury to life or limb." *Id*. Neither the trier of fact nor this court is required to accept defendant's subjective interpretation of the facts. The question is whether, taking the evidence and reasonable inferences in a light most favorable to the conviction, "the evidence is so improbable, unsatisfactory, or inconclusive that it leaves a reasonable doubt of the defendant's guilt." *Holman*, 2014 IL App (3d) 120905, ¶ 56.

¶ 49    Newsom stopped his vehicle south of the intersection where defendant stopped. There is no evidence Newsom said anything or was brandishing a weapon. These facts distinguish this case from the court's decision in *People v. White*, 87 Ill. App. 3d 321 (1980). In *White*, this court found that where the victim had previously attacked the defendant, "it cannot be said that [the] defendant's belief that he was in danger of death or great bodily harm was unreasonable beyond a reasonable doubt." *Id*. at 324. In that case, however, in addition to the prior attack on the night of the killing, the victim in *White* re-confronted the defendant and was at that time brandishing the weapon the victim had used before and was at that time threatening the defendant's life. *Id*. at 323. The same is not true here where the evidence is sufficient to prove that Newsom did not stop defendant's vehicle but it was the other way around, and Newsom continued to sit in his vehicle, and Newsom did not display his weapon.

¶ 50    Nor is defendant aided by this court's decision in *People v. Williams*, 56 Ill. App. 2d 159 (1965). Although in that case this court held the defendant was "under no duty to flee" from his later victims, the court expressly limited its judgment to the peculiar facts of that case. See *id*. In *Williams*, this court noted that we "only hold that when a person comes to the aid of another who

has been the victim of a battery, said person has the right to use deadly force, if the parties who were the assailants attack him and if the other requirements of self-defense are met." *Williams*, 56 Ill. App. 2d at 169. *Williams* is further distinguishable by the fact that at the time of the killing in that case, the victims had attacked the defendant. We reiterate, Newsom's earlier assault notwithstanding, at the time Marsharra shot at Newsom the evidence was sufficient to permit the trier of fact to reasonably conclude that there was no subsequent assault by Newsom.

¶ 51    In this case, the trier of fact could reasonably conclude that defendant and Marsharra's "aggression went well beyond the bounds of reasonable judgment, regardless of whether [Newsom] was the initial aggressor." See *id*. Therefore, we reject defendant's claim of self-defense and arguments in favor of reducing his conviction to second degree murder. See *Guja*, 2016 IL App (1st) 140046, ¶ 52 ("If the State negates any of these elements, the defendant's claim of self-defense must be rejected."). Defendant's convictions, other than on count III of the indictment, are affirmed.

¶ 52                      FAVORABLE TREATMENT and *BRADY*

¶ 53    Defendant argues the State committed a *Brady* violation resulting in a deprivation of defendant's constitutional right to due process by failing to disclose to defendant favorable treatment given to Newsom in exchange for Newsom's testimony. The State refutes defendant's claim and asserts that Newsom "received no benefits in exchange for his testimony." Initially, however, the State argues that "a considerable portion of the evidence presented to support those alleged claims are matter *dehors* the record." The State argues this court should reject defendant's reliance on that evidence as improper on direct appeal. Defendant "concedes that he has no evidence of what was discussed [with Newsom] behind closed doors" but defendant

asserts that "plainly, Newsom received some benefit or consideration" in exchange for his testimony at defendant's trial.

¶ 54    Defendant recites a litany of instances of alleged favorable treatment of Newsom by the State in unrelated, separate cases after Newsom spoke to police. Defendant provides circuit court of Cook County case numbers for those cases (but oddly fails to cite this court's familiar rule that we may take judicial notice of public records). *People v. Spivey*, 2017 IL App (1st) 123563, ¶ 5 (citing *People v. Jimerson*, 404 Ill. App. 3d 621, 634 (2010) ("reviewing court may take judicial notice of public records and other judicial proceedings")). We agree with the State and we will not consider defendant's evidence *dehors* the record. *People v. Ligon*, 239 Ill. 2d 94, 105-06 (2010) (addressing claim of ineffective assistance of counsel and finding that claim could not be considered on direct appeal "where evidentiary basis is *dehors* the record" (quoting *People v. Whitehead*, 169 Ill. 2d 355, 372 (1996)) but "should be brought on collateral review"). Because the evidence that defendant offers in support of this claim is *dehors* the record, we will not consider defendant's claim at this time.

¶ 55    While defendant's claims may have arguable merit, we find that they are premature. Defendant's claims require the development of an evidentiary record. Because the facts on which defendant must rely to support this claim are *dehors* the current record, we cannot adequately consider them and the claim is better suited to postconviction proceedings. See *People v. Coleman*, 391 Ill. App. 3d 963, 965 (2009) (declining "to consider this argument because it requires evidence external to the record and, thus, is better suited for postconviction proceedings"). See *People v. Hobley*, 182 Ill. 2d 404, 437–38 (1998) (citing *People v. Thomas,* 38 Ill. 2d 321, 323-24 (1967) (*res judicata* does not preclude consideration in post-conviction proceedings of "constitutional questions which, by their nature, depended upon facts

22

not found in the record")). Therefore, we decline to consider the argument defendant's right to due process was violated by the State's failure to disclose certain facts concerning Newsom's testimony.

¶ 56                              PHYSICAL ACTS and ONE-ACT, ONE-CRIME

¶ 57    Finally, defendant argues that should his conviction for attempt (first degree murder) of Newsom (count LXI) be affirmed (it is) then under one-act, one-crime principles, this court must merge defendant's conviction for aggravated discharge of a firearm at Harris (counts LXVI and LXVIII) with the conviction for attempt (first degree murder) because the indictment on each count alleges the same physical act. The State responds the one-act, one-crime rules only applies to multiple convictions for offenses against a single victim, and since defendant's convictions all involve different victims, they are proper.

¶ 58    Multiple convictions arising out of the same physical act violate the one-act, one-crime rule. *People v. Coger*, 2019 IL App (1st) 163250, ¶ 28. Whether multiple convictions violated the one-act, one-crime rule presents a question of law that we review *de novo*. *Id*. Our supreme court has defined an "act" as " 'any overt or outward manifestation which will support a different offense.' [Citation.]" *People v. Smith*, 2019 IL 123901, ¶ 18. Multiple convictions are allowed "when a common act is (1) part of both offenses or (2) part of one offense and the only act of the other offense." *Id*. When both offenses involve a common act that serves as the basis for both convictions, for both offenses to stand one offense must involve an additional act that is not required for the other offense. *Id*. at 402. Thus, if the "common act was only part of one offense and the sole act of the other offense, the two offenses were not carved from precisely the same physical act." *Id*. (citing *People v. Coats*, 2018 IL 121926, ¶ 16).

¶ 59    The State relies on this court's decision in *People v. Leach*, 2011 IL App (1st) 090339. There, this court held that "the one-act, one-crime rule only applies to multiple convictions for acts against a single victim. [Citation.] Multiple convictions are proper when there are multiple victims." *Leach*, 2011 IL App (1st) 090339, ¶ 30. In that case, the defendant fired three shots. Two shots struck and killed one victim and were "the basis for the second-degree murder conviction." *Id*. ¶ 30. The third shot traveled toward the second victim, and it was that shot "that the State used to support the aggravated discharge of a firearm charge." *Id*. The *Leach* court did not analyze the language of the charging instrument to determine if the counts alleged separate shots. See *id*. ¶¶ 28-34. However, in its recounting of the evidence at trial, the *Leach* court noted that the evidence was that the defendant fired two shots at the first victim; then, it was "clear that [the] defendant fired his gun at least one more time with the bullet traveling toward the group of onlookers, which included [the second victim.]" *Id*. ¶ 7. The jury instructions initially instructed the jury that to sustain the charge of aggravated discharge of a firearm, the "State must prove *** the defendant discharged the firearm in the direction of [the second victim (naming him)]." *Id*. ¶ 8. After the jury asked a question as to whether this charge applied only to the named second victim, the trial judge withdrew that instruction and replaced it with one that imply read "another person" rather than the name of the second victim. *Id*. ¶ 9. On appeal, the court expressly rejected the defendant's argument that the jury necessarily found that all three shots were fired in the direction of the first victim and no one else as "completely speculative." *Id*. ¶ 33. The court concluded that "[b]ecause the evidence shows that defendant did not commit multiple acts against a *single victim*, the one-act, one-crime rule does not apply to defendant's convictions for second-degree murder and aggravated discharge of a firearm." (Emphasis added.)  *Id*. ¶ 34.

¶ 60    We find that defendant's multiple convictions in this case do not violate the one-act, one-crime rule because the State charged defendant with separate acts by charging defendant with firing in the direction of Newsom resulting in the conviction for attempt (first degree murder) and with firing in the direction of Harris resulting in the conviction for aggravated discharge of a firearm.

"One-act, one-crime analysis involves the following two steps: (1) the reviewing court must determine whether the defendant's conduct consisted of one physical act or separate physical acts and, if the court concludes that the conduct consisted of separate acts, (2) the court must determine whether any of those offenses are lesser-included offenses. [Citation.] *** [S]eparate blows, although closely related, may constitute separate acts sufficient to support multiple convictions. [Citation.] *** To sustain multiple convictions for closely related separate blows, the State must provide the defendant notice of its intent to treat each blow as a separate act by apportioning those separate blows at the trial level. [Citation.] If the court determines that the State pursued the charges against the defendant as a single physical act, then multiple convictions are improper and the reviewing court need not proceed to the lesser-included step of the one-act, one-crime analysis. [Citation.].

Accordingly, we must first determine whether the State alleged that [the defendant's] conduct consisted of separate acts or a single physical act. As this determination is one of law, we review it *de novo*. [Citation.]" *In re Rodney S.*, 402 Ill. App. 3d 272, 281-82 (2010) (citing *In re Samantha V.*, 234 Ill. 2d 359, 369 (2009)).

See also *People v. Melecio*, 2017 IL App (1st) 141434, ¶ 70 (charging instrument must reflect intent to apportion the accused's conduct into separate crimes to survive one-act, one-crime challenge).

¶ 61    Accordingly, we will first look to the indictment to determine whether defendant's conduct consisted of separate acts or a single physical act. *People v. Curtis*, 354 Ill. App. 3d 312, 328 (2005). In this case, count LXI for the attempt murder of Newsom charged that defendant "with intent to kill, did an act, to wit: shot at Dominic Newsom while armed with a firearm, which constituted a substantial step towards the commission of the offense of first degree murder." Count LXII contains identical language but names Marquez Harris. Count LXVIII for aggravated discharge of a firearm toward Harris charged that defendant "knowingly discharged a firearm in the direction of another person, to wit: Marquez Harris." Count LXVII contained identical language but named Dominic Newsom. Here, defendant was charged with attempt (first degree murder) for firing a gun at Newsom and defendant was charged with aggravated discharge of a firearm for firing a gun at Harris. "Although these offenses have in common the act of defendant [firing a gun at the vehicle occupied by Newsom and Harris,] as long as there are multiple acts, their interrelationship does not preclude multiple convictions. *Curtis*, 354 Ill. App. 3d at 328 (citing *People v. Rodriguez*, 169 Ill. 2d 183, 189 (1996)).

¶ 62    This case is distinguishable from *People v. Green*, 339 Ill. App. 3d 443 (2003). In *Green*, this court held that because the State failed to treat the defendant's conduct as multiple acts, the convictions for multiple offenses could not be sustained. *Green*, 339 Ill. App. 3d at 459. In that case, the defendant "committed a series of closely related but separate acts when he fired four or five shots with a pistol." *Id*. But the State did not apportion those shots so that each formed the basis for separate crimes, although it could have. *Id*. (citing *People v. Crespo*, 203 Ill. 2d 335,

344 (2001)). In this case, the State did treat the conduct of firing in the direction of Newsom and firing in the direction of Harris as multiple acts and charged defendant accordingly. Because the State treated defendant's conduct as separate acts, and the separate conviction is not for a lesser-included offense (see *People v. Files*, 260 Ill. App. 3d 618, 630 (1994); see also *People v. Shum*, 117 Ill. 2d 317, 363 (1987) ("In Illinois it is well settled that separate victims require separate convictions and sentences.")), we find that defendant's multiple convictions do not violate the one-act, one-crime rule. *In re Rodney S.*, 402 Ill. App. 3d 272, 281-82 (2010); *Leach*, 2011 IL App (1st) 090339, ¶ 30.

¶ 63                                 CONCLUSION

¶ 64    For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed in part, reversed in part and the cause is remanded to the trial court to resentence defendant.

¶ 65    Affirmed in part, reversed in part, and remanded.